**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION**

| | | |
|---|---|---|
| **RONALD EUGENE CREWEY, JR.,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:18cv00015 |
| | ) | **REPORT AND** |
| **ANDREW SAUL,**[1] | ) | **RECOMMENDATION** |
| **Commissioner of Social Security,** | ) | |
| Defendant | ) | By:   PAMELA MEADE SARGENT |
| | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Ronald Eugene Crewey, Jr., ("Crewey"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 *et seq.* (West 2011 & 2018 Supp.). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). Neither party has requested oral argument. This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*,

---

[1] Andrew Saul became the Commissioner of Social Security on June 17, 2019; therefore, he is substituted for Nancy A. Berryhill as the defendant in this case.

829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Crewey protectively filed his application for DIB on November 18, 2013, alleging disability as of July 30, 2013, based on gout; arthritis; osteoarthritis; knee problems; chronic pain; and depression. (Record, ("R."), at 11, 197, 200-01, 216, 230.) The claim was denied initially and upon reconsideration. (R. at 88-90, 93-96, 98-100.) Crewey then requested a hearing before an administrative law judge, ("ALJ"). (R. at 101-02.) The ALJ held a hearing on February 1, 2017, at which Crewey was represented by counsel. (R. at 37-61.)

By decision dated March 29, 2017, the ALJ denied Crewey's claim. (R. at 11-31.) The ALJ found that Crewey met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2018. (R. at 13.) The ALJ found that Crewey had not engaged in substantial gainful activity since July 30, 2013, the alleged onset date.[2] (R. at 13.) The ALJ found that the medical evidence established that Crewey had severe impairments, namely degenerative joint disease and osteoarthritis of the knees with a left knee replacement; gout; osteoarthritis; heel spur; degenerative joint disease of the ankle; and shoulder

---

[2] Therefore, Crewey must show that he was disabled between July 30, 2013, the alleged onset date, and March 29, 2017, the date of the ALJ's decision, in order to be eligible for benefits.

tendinitis, but he found that Crewey did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 13, 16.) The ALJ found that Crewey had the residual functional capacity to perform simple, routine, sedentary work[3] that did not require operation of foot controls; that did not require more than occasional climbing of ramps and stairs, stooping, kneeling, crouching or crawling; that did not require more than occasional exposure to extreme cold and vibrations; and that did not require him to operate moving machinery or to work around unprotected heights and hazardous machinery. (R. at 16.) The ALJ found that Crewey was unable to perform his past relevant work. (R. at 29.) Based on Crewey's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of jobs existed in the national economy that Crewey could perform, including jobs as an order clerk, a surveillance system monitor and an assembler. (R. at 30-31.) Thus, the ALJ concluded that Crewey was not under a disability as defined by the Act, and was not eligible for DIB benefits. (R. at 31.) *See* 20 C.F.R. § 404.1520(g) (2018).

After the ALJ issued his decision, Crewey pursued his administrative appeals, (R. at 195, 256-60), but the Appeals Council denied his request for review. (R. at 1-5.) Crewey then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See*

---

[3] Sedentary work involves lifting items weighing up to 10 pounds with occasional lifting or carrying of articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. § 404.1567(a) (2018).

20 C.F.R. § 404.981 (2018). This case is before this court on the Commissioner's motion for summary judgment[4] filed October 29, 2018.

## II. Facts

Crewey was born in 1976, (R. at 200), which classifies him as a "younger person" under 20 C.F.R. § 404.1563(c). Crewey has some college education and past work experience as a boat salesman, a boat mechanic and a parts manager. (R. at 45-47, 217.) Crewey stated that he was prescribed a cane following his first knee replacement. (R. at 49-50.) He stated that he had three to four episodes of gout per month, each lasting a day to seven days. (R. at 50.) Crewey stated that his pain medication made his pain tolerable. (R. at 54.)

Casey B. Vass, a vocational expert, also was present and testified at Crewey's hearing. (R. at 57-60.) Vass was asked to consider a hypothetical individual of Crewey's age, education and work history, who could perform sedentary work that did not require operation of foot controls or exposure to hazardous machinery, unprotected heights and operational control machinery; that required no more than occasional climbing of ramps or stairs, stooping, kneeling, crouching or crawling; and that did not require more than occasional exposure to extreme cold and vibrations; and who would be limited to performing only simple, routine tasks. (R. at 57-58.) Vass testified that such an individual could not perform Crewey's past work, but could perform other work existing in significant numbers in the national economy, including jobs as an order clerk, a surveillance system monitor and a final assembler. (R. at 57-58.) Vass next was asked to

---

[4] While Crewey filed a Brief In Support Of Plaintiff's Motion For Summary Judgment, ("Plaintiff's Brief"), he did not file a motion for summary judgment.

consider the same individual, but who could not stand, walk and sit in any combination to complete an eight-hour workday, but who could do so "maybe six hours a day." (R. at 58.) Vass stated that there would be no jobs available that such an individual could perform. (R. at 58.) Vass stated that there would be no jobs available should the individual be required to lie down and elevate his legs two to three hours during a workday. (R. at 58-59.)

Vass then was asked to consider the first hypothetical individual, but who would require the use of a cane and who would be limited to occasional reaching, handling and fingering bilaterally. (R. at 59.) He stated that the previously identified jobs of order clerk and assembler would be eliminated. (R. at 59.) Next, Vass was asked if the surveillance system monitor job would be impacted should the individual be required to change positions due to his ability to stand for only 30 minutes at a time, walk 30 minutes at a time and sit up to one hour at a time. (R. at 60.) He stated that, should the individual be required to walk away from the monitors, the surveillance system monitor job would be impacted. (R. at 60.)

In rendering his decision, the ALJ reviewed records from Dr. Carolina Bacani-Longa, M.D., a state agency physician; Dr. Bert Spetzler, M.D., a state agency physician; Radford Orthopedic Center, P.C.; Roanoke Memorial Hospital; Christiansburg Family Medicine; University of Virginia Health System, ("UVA"); Carilion Clinic Orthopaedic Surgery – Roanoke, ("Roanoke Orthopaedics"); Carilion Clinic Roanoke Rheumatology, ("Roanoke Rheumatology"); Wytheville Family Medicine; Wellmont Medical Associates; Virginia Interventional Pain & Spine Center, ("Pain & Spine Center"); Lewis-Gale Physicians, LLC; Pain Care Center of Blacksburg, ("Pain Care Center"); Twin County Rheumatology;

Cameron Ratcliff, PA, a physician assistant; Smyth County Community Hospital, ("Smyth County"); and Dr. Jan Pijanowski, M.D.

On May 29, 2013, Crewey was seen at Radford Orthopedic Center, P.C., for an evaluation of left knee pain, and an arthroscopic debridement and repair was recommended. (R. at 273-75.) On May 30, 2013, Dr. Kenneth Gray, M.D., performed an arthroscopic debridement of gouty inflammation, medial and lateral meniscus tears, multiple loose bodies, tricompartmental chondroplasty of the left knee and excision of the gouty tophus from the medial aspect of the left knee. (R. at 278-84.) On June 5, 2013, Dr. Gray concluded that Crewey was doing well, there was minimal swelling, and Crewey should limit himself to sedentary work for the first week or two following his surgery. (R. at 276-77.) On June 19, 2013, Dr. Gray concluded that Crewey's knee joint was doing "relatively well," although he had chondromalacial symptoms and needed to work aggressively on strengthening exercises for his knee. (R. at 285.) Dr. Gray released him to work with self-limitations. (R. at 285.)

On August 2, 2013, Dr. Reed R. Lambert, M.D., a physician with Christiansburg Family Medicine, saw Crewey for complaints of knee pain and worsened depression. (R. at 411.) Crewey stated that he believed he took extra pain medication without realizing it while sleep walking. (R. at 411.) Crewey was diagnosed with chronic knee pain, insomnia and depression. (R. at 413.) No antidepressant medication was prescribed, as Dr. Lambert wanted to see if improved sleep and pain control helped with his mood. (R. at 413.)

On August 14, 2013, Crewey was evaluated by Dr. Michael Wolfe, M.D., a physician with Roanoke Orthopaedic, who recommended a left knee replacement

surgery. (R. at 468-76.) Crewey's gait was antalgic, and he had trouble getting up onto the exam table, but he did not need an assistive device to walk. (R. at 472.) X-rays of Crewey's left knee showed demonstrable joint space narrowing, subchondral sclerosis and osteophyte formation. (R. at 473.) On September 4, 2013, Crewey denied joint pain; swelling; stiffness; myalgias; back pain; weakness; parasthesias; anxiety; and depression. (R. at 422.) Dr. Lambert reported that Crewey's musculoskeletal system showed no joint pain or swelling; he had full range of motion; his extremities had no clubbing, cyanosis or edema, with full range of motion throughout; his back was nontender; and his mood and affect were normal. (R. at 428.) Dr. Lambert diagnosed gout and chronic knee pain. (R. at 428.)

On September 20, 2013, Crewey was admitted to Roanoke Memorial Hospital for a total left knee arthroplasty. (R. at 286-95.) Upon discharge, Dr. Wolfe noted that Crewey could perform activities as tolerated with no heavy lifting, pushing or pulling. (R. at 295.) On October 1, 2013, Crewey reported adequate pain control. (R. at 491.) There was no swelling, discoloration or deformity of the wound, and the site was minimally tender to palpation. (R. at 492.)

On October 15, 2013, Crewey was seen at Christiansburg Family Medicine for complaints of gout, chest congestion and cough. (R. at 433.) He stated that he was doing well post-surgery, but was having some pain in his elbows and ankles. (R. at 431.) On October 29, 2013, Crewey reported depression, insomnia and joint, hip and knee pain. (R. at 436, 438.) He stated that his knee pain had improved since surgery. (R. at 436.) Crewey was diagnosed with depression, chronic knee pain, gout and gastroesophageal reflux disease, ("GERD"). (R. at 438.)

When Crewey was seen at Roanoke Orthopedic, on November 5, 2013, he was continuing to make progress and was recovering his functional motion and strength. (R. at 496.) Crewey complained of generalized knee pain, but he had no mechanical symptoms. (R. at 496.) Examination revealed some tenderness and decreased range of motion, but Crewey exhibited 4/5 quad strength with no instability or hyperextension. (R. at 496.) Although Crewey remained tender to palpation in the suprapatellar region, his knee was stable to varus and valgus stressing at full extension and at 30 degrees of flexion. (R. at 496.) X-rays showed continued satisfactory position of the implants and no signs of loosening, migration or failure. (R. at 496.)

That same day, Crewey was seen at Roanoke Rheumatology for evaluation and treatment of gout. (R. at 456-63.) On examination, Crewey had full range of motion in his ankles and no tenderness or swelling. (R. at 458.) Dr. Lambert stated that he believed that Crewey's gout could be controlled, and it would not affect his ability to return to work. (R. at 459.) Medication modifications were made to gain better control of Crewey's symptoms. (R. at 460-61.)

On November 25, 2013, Crewey presented to the emergency room at Smyth County for complaints of left knee pain and swelling. (R. at 731-49.) X-rays of Crewey's left knee did not reveal any acute findings, though the examination revealed some erythema and warmth. (R. at 743, 749.) Crewey was diagnosed with gout and given steroids and narcotic medication. (R. at 743.) On December 21, 2013,[5] Crewey presented to the emergency room at Smyth County for complaints

_____

[5] It was noted that Crewey visited the emergency room multiple times for the same complaint. (R. at 729.) Crewey visited Johnston Memorial Hospital on November 14, 2013, and December 10, 2013, and Smyth County on November 25, 2013. (R. at 729.) In addition, Crewey had 14 subsequent visits to the emergency room for complaints of knee, left wrist, abdominal, right ankle, left foot and left elbow pain; cough and congestion; gout; a right leg injury; and a

of left knee pain. (R. at 719-30.) He was diagnosed with chronic knee pain, he received a Ketorolac injection, and he was told to take over-the-counter medication. (R. at 728, 730.)

On January 10, 2014, Dr. Wolfe wrote a "To Whom it May Concern" letter, stating that Crewey could not return to work and was expected to be disabled from gainful employment for at least 12 months. (R. at 660-61.)

On February 7, 2014, Crewey was seen at Wytheville Family Medicine for complaints of back pain and chest congestion. (R. at 587.) Crewey requested OxyContin 10 mg because that helped him in the past, as did oxycodone. (R. at 588.) On examination of Crewey's knees, ankles and feet, he had normal range of motion and no swelling, effusion, ecchymosis, deformity, laceration, erythema or bony tenderness. (R. at 590.) It was noted that Crewey's bronchitis was worsened by his smoking, and his request for narcotic medication was discussed. (R. at 591-92.) Crewey was offered Ultram, but he stated that it was "like taking water," and he also refused Mobic. (R. at 592.) Rebecca A. Biersbach, F.N.P., a family nurse practitioner with Wytheville Family Medicine, explained that narcotics were not prescribed to new patients, and Crewey responded that he wanted to see a provider that would "guarantee" him "pain pills." (R. at 592.) Crewey refused a referral to pain management and told Biersbach that she needed to provide him with pain medication. (R. at 592.) Crewey stated that he had visited many doctors in the surrounding area attempting to find a practitioner that would treat his medical issues. (R. at 592.)  On February 20, 2014, Crewey complained of knee pain and

---

shoulder sprain. (R. at 686-730, 797-834, 850-61, 906-81.) His diagnoses included gout, (R. at 713, 802, 812, 937); left wrist pain, (R. at 700); chronic pain, (R. at 700, 971, 974); acute bronchitis, (R. at 853, 861, 937); kidney stones, (R. at 821); foot contusion, (R. at 961); acute mid back pain, (R. at 951); knee and leg sprain, (R. at 925); and shoulder sprain, (R. at 906.)

low energy, but was feeling better overall. (R. at 600.) He reported that pain medication worked best for his knee pain. (R. at 600.) Swelling and tenderness was noted in Crewey's left knee, but he remained neurovascularly intact. (R. at 602.) Crewey again was denied narcotic medication. (R. at 602.)

On March 25, 2014, Crewey was seen at the Rheumatology Clinic at UVA for multiple joint pain. (R. at 511.) Crewey's physical exam was unremarkable for any joint swelling, but he had pictures on his phone that showed obvious swelling and erythema in his knees and ankles. (R. at 514.) Crewey was diagnosed with polyarthritis, chest pain and gout. (R. at 514.) X-rays of Crewey's right knee showed moderate to severe degenerative changes. (R. at 514.) X-rays of Crewey's right ankle showed severe degenerative changes with irregular contour and flattening of the medial surface, likely related to the sequela of gout; mild to moderate degenerative changes of the left tibiotalar joint with anterior osteophytic changes which could predispose Crewey to anterior impingement; and lucency of the medial talar dome was concerning for an osteochondral lesion. (R. at 514-15, 531.) Chest x-rays showed no pneumonia, pleural effusion, pulmonary edema or pneumothorax. (R. at 526.) On April 28, 2014, Crewey continued to complain of right ankle and shoulder pain and gout; however, his gait was normal. (R. at 615.)

On June 16, 2014, Crewey saw Dr. Tejal Raju, M.D., at Virginia Interventional Pain & Spine Center for diffuse arthritis and pain flares secondary to gout. (R. at 575.) Crewey denied any new motor or sensory deficit and reported that his pain was 50 percent better until his recent gout flare. (R. at 575.) He also reported 100 percent relief with the left shoulder injection he received at his last visit. (R. at 575.)

On June 18, 2014, Dr. Carolina Bacani-Longa, M.D., a state agency physician, completed a medical assessment, finding that Crewey could perform light work.[6] (R. at 67-69.) She found that Crewey could frequently balance, stoop, kneel, crouch and crawl; occasionally climb ramps and stairs; and never climb ladders, ropes and scaffolds. (R. at 68.) No manipulative, visual or communicative limitations were noted. (R. at 68.) Dr. Bacani-Longa opined that Crewey should avoid concentrated exposure to vibrations and hazards, such as machinery and heights. (R. at 69.)

On July 5, 2014, Crewey presented to the emergency room at Smyth County for complaints of abdominal pain. (R. at 815-34.) A urine drug screen performed two days previously, was positive for methadone. (R. at 827, 828.) A CT scan of Crewey's abdomen and pelvis showed kidney stones. (R. at 831-34.) He was diagnosed with kidney stones. (R. at 821.)

On July 16, 2014, Crewey was seen at Lewis-Gale Physicians, LLC, for evaluation of his gout. (R. at 542.) Crewey reported two to three monthly gout flares. (R. at 542.) On examination, Crewey had some tenderness on the left metatarsophalangeal, ("MTP"), joints, but no other deficits were noted. (R. at 543.) On August 4, 2014, Crewey had full range of motion in the joints without synovitis; his right shoulder was tender with impingement; and he had diffuse tenderness all over. (R. at 541.) Crewey was diagnosed with gout, rotator cuff tendinitis and chronic myofascial pain. (R. at 541.)

---

[6] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2018).

On August 23, 2014, Crewey was seen at Wellmont Medical Associates for complaints of left ankle pain with associated loss of range of motion and inability to bear weight. (R. at 551-55.) Upon examination, Crewey had decreased range of motion and tenderness of the left ankle. (R. at 555.) Crewey's joint appeared painful, but stable. (R. at 555.) Crewey was diagnosed with a gout attack. (R. at 555.) On August 27, 2014, Crewey complained of worsening symptoms with recent medication change. (R. at 581.) He reported that he had been to the beach recently and noticed his symptoms improved. (R. at 581.) On August 28, 2014, Crewey was discharged from Dr. Raju's practice for violation of his pain medication contract. (R. at 583.) Specifically, Crewey had a prescription for oxycodone/acetaminophen filled b another provider four days prior to his last visit with Dr. Raju, at which time he was prescribed OxyContin and Percocet. (R. at 581, 583.)

On October 10, 2014, Dr. Bert Spetzler, M.D., a state agency physician, completed a medical assessment, finding that Crewey could perform light work. (R. at 80-82.) He found that Crewey could stand and/or walk a total of two hours in an eight-hour workday; sit about six hours in an eight-hour workday; frequently balance; occasionally climb ramps and stairs, stoop, kneel, crouch and crawl; and never climb ladders, ropes and scaffolds. (R. at 80-81.) Dr. Spetzler also found that Crewey had a limited ability to push and pull with his lower extremities. (R. at 80.) No manipulative, visual or communicative limitations were noted. (R. at 81.) Dr. Spetzler opined that Crewey should avoid concentrated exposure to vibrations and hazards, such as machinery and heights. (R. at 81-82.)

On October 13, 2014, Crewey reported to Dr. Wolfe that he was unable to return to work because of pain in his right knee. (R. at 670.) Examination of

Crewey's left knee revealed active range of motion; no instability at any position of flexion; and no warmth, erythema or effusion. (R. at 670.) Crewey's right knee showed boggy synovitis without effusion and no warmth, redness or pathologic laxity. (R. at 670.) Dr. Wolfe noted that Crewey's left knew was doing well. (R. at 671.) Crewey wished to proceed with a right total knee replacement. (R. at 671.)

On November 12, 2014, Crewey obtained ankle-foot orthotics. (R. at 643.) Crewey complained of a gout flare in his left ankle. (R. at 640.) Examination revealed edema in both feet and bilateral ankle pain. (R. at 643.)

On December 28, 2014, Crewey presented to the emergency room at Smyth County for complaints of left elbow pain. (R. at 797-806.) He reported that he had been putting cabinets up at his mother's house three weeks prior. (R. at 805.) He had tenderness in the left elbow. (R. at 801-02.) X-rays of Crewey's left elbow showed a small osteophyte and soft tissue swelling. (R. at 806.) He was diagnosed with gout. (R. at 802.)

On March 26, 2015, Crewey was seen at the Pain Care Center for complaints of diffuse body pain. (R. at 1104-07.) It was noted that Crewey's toxicology screen was appropriate, though the screening performed on March 5, 2015, revealed noncompliance. (R. at 1104-05.) Examination revealed that Crewey was in no distress; he used no assistive devices; and he had a normal mood and affect. (R. at 1106.) On April 15, 2015, Crewey complained of constant and worsening pain, stating that he was experiencing a gout flare in his right elbow, right pinky and left toes. (R. at 1100-03.) He rated his then-current pain as an eight or nine on a 10-point scale, but stated that his medication lowered his pain to a five, which he found tolerable. (R. at 1101.) On examination, Crewey was in no acute distress; he

walked with a cane; he had joint redness and swelling in his right upper
extremities; joint redness, swelling and tenderness in his little finger; and he had a
normal mood and affect. (R. at 1102.) Overall, Crewey's pain was noted as well-
controlled and stable. (R. at 1102.)

On May 7, 2015, Crewey's urine drug screen showed noncompliance,
though he denied taking any tramadol in the previous two months. (R. at 1096-99.)
Crewey continued to utilize a cane, but no other deficits were noted on
examination. (R. at 1098.) On May 21, 2015, Crewey appeared to be in pain; he
used a cane; he had a normal mood and affect; and he had swelling and warmth in
his right elbow and swelling in his pinky finger. (R. at 1094.) On June 15, 2015,
although Crewey continued to complain of constant pain, he reported that he was
satisfied with his medication regimen. (R. at 1088-91.) Overall, Crewey's pain was
noted as well-controlled and stable. (R. at 1090.) On July 9, 2015, and August 6,
2015, Crewey's pain was noted as well-controlled and stable. (R. at 1082, 1086.)

On November 2, 2015, Crewey reported that he was experiencing
exacerbation of his gout. (R. at 1068-71.) On examination, crepitus was noted in
both knees, and posterior drawer tests[7] were positive bilaterally. (R. at 1070.) Dr.
Duane Dixon, M.D., a physician with the Pain Care Center, prescribed a pain patch
and oxycodone. (R. at 1070.) On December 16, 2015, Crewey again complained of
an acute gout exacerbation. (R. at 1059.) He also reported that he was having
issues with his pain patch staying attached. (R. at 1060.) Crewey was advised on
better application of his patch. (R. at 1060.)

---

[7] A posterior drawer test is a specific maneuver used to test the stability of a joint,
especially the knee joint. It specifically tests the function of the posterior cruciate ligament,
("PCL"). A positive result is seen when there is an injury to the PCL, such as a PCL tear. *See*
https://www.verywellhealth.com/posterior-drawer-test-2549600 (last visited Aug. 13, 2019.)

On January 8, 2016, Crewey reported a gout flare in addition to diffuse body pain. (R. at 1055.) He reported that his pain medications were not as effective, and his medication was increased. (R. at 1056-57.) On January 13, 2016, Crewey reported some improvement in his pain. (R. at 1051.)

On January 28, 2016, Crewey was seen at Twin County Rheumatology to establish care for chronic gouty arthritis. (R. at 654-59.) Bilateral ankle and right knee swelling was noted on examination. (R. at 655.) Dr. William Gruhn, M.D., stated that Crewey was completely disabled. (R. at 655.)

On February 1, 2016, Dr. Pijanowski completed a pain assessment, finding that Crewey's pain was present and incapacitating; physical activity increased Crewey's pain to the extent that medication and/or bed rest was necessary; and Crewey was restricted from the workplace and was unable to function at a productive level. (R. at 1109.)   On February 2, 2016, Crewey described his pain as intermittent and improving. (R. at 1047.) On February 24, 2016, Crewey again described his pain as intermittent and improving. (R. at 1042.) He stated that he slept poorly, but had good pain control during the day. (R. at 1042.) Crewey continued to state that he was satisfied with his medication regimen. (R. at 1042.) On March 8, 2016, Crewey reported improvement in his pain levels and improved sleep. (R. at 1039.)

On April 5, 2016, Crewey reported that he was pleased with his current results, stating his new gout medication was beneficial. (R. at 1037.) He stated he felt the best he had in two years and that he planned to go on a trip to Charleston, South Carolina. (R. at 1036.) Crewey's pain was reported as well-controlled and stable. (R. at 1038.)

On April 13, 2016, Crewey presented to the emergency room at Smyth County, complaining of a right leg injury after a John Deere garden tractor fell on him. (R. at 918-32.) X-rays of Crewey's left foot showed degenerative changes at his ankle, but no fracture or dislocation. (R. at 928.) X-rays of Crewey's right ankle showed chronic irregularity of the talar dome related to avascular necrosis or old trauma, as well as degenerative changes throughout, but no fracture or dislocation. (R. at 929.) X-rays of Crewey's right knee showed degenerative changes and probable small knee joint space effusion. (R. at 931.) Crewey was diagnosed with a knee and leg sprain. (R. at 925.)

On April 26, 2016, improvement was noted in Crewey's gout and uric acid levels. (R. at 650.) On May 4, 2016, Crewey continued to report good benefit from his medications, including improved sleep and activity level. (R. at 1033.) Crewey's toxicology screen was inconsistent, revealing the presence of amphetamine, methamphetamine and Suboxone. (R. at 1026.) On June 2, 2016, Crewey's toxicology screen was positive for amphetamine and methamphetamine. (R. at 1026.) Crewey reported that he had only taken Sudafed; however, it was noted that the thresholds were high enough to suggest amphetamine abuse. (R. at 1022, 1026.)

On June 26, 2016, Crewey presented to the emergency room at Smyth County for a shoulder sprain after being struck by a tree branch while mowing. (R. at 906-17.) X-rays of Crewey's ribs and shoulder were normal, with the exception of evidence of an old gunshot wound in the left upper chest and shoulder region. (R. at 916-17.)

On July 12, 2016, Crewey reported that his pain was mostly controlled. (R. at 1022-23.) On August 9, 2016, it was noted that Crewey's pill counts had been inaccurate at the last three counts. (R. at 1018.) On September 6, 2016, it was noted that Crewey's drug screening from the previous month was positive for alcohol, and Crewey stated that he had a beer occasionally. (R. at 1015.) Crewey continued to report good benefit from his medications, including improved sleep and activity level. (R. at 1014.) It was noted that Crewey's pain was well-controlled and stable. (R. at 1016.)

On September 20, 2016, Dr. Carl S. Henderson, D.O., a physician with Roanoke Rheumatology, saw Crewey for evaluation and treatment of gout. (R. at 983-92.) Crewey had full range of motion of all extremities, with the exception of some pain on range of motion of his left knee. (R. at 985.) Dr. Henderson noted that Crewey's gout would be under good control over the next few months with treatment. (R. at 987-88.) He noted that Crewey's arthritis may need addressing, as his ankle osteophytes may lead to some impingement symptoms. (R. at 988.)

On October 4, 2016, Crewey continued to report good benefit from his medications, including improved sleep and activity level. (R. at 1008-09.) Examination revealed a normal gait, station and coordination, with no assistive device; intact sensation; and normal mood and affect. (R. at 1011.) It was noted that Crewey's pain was well-controlled and stable. (R. at 1011.) On November 28, 2016, Crewey reported that he used too many pain patches because the patches fell off due to excessive sweating. (R. at 998.) Crewey continued to report good benefit from his medications, including improved sleep and activity level. (R. at 999.) Examination revealed a normal gait, station and coordination, with no assistive device; intact sensation; and normal mood and affect. (R. at 1001.)   The patches

were discontinued, and oral medication was added to Crewey's regimen. (R. at 1001.) He was referred to Wake Forest Rheumatology for further evaluation. (R. at 1002.) On December 26, 2016, Crewey reported improvement in his gout pain; his urine drug screen was positive for alcohol. (R. at 994.) Examination revealed a normal gait, station and coordination, with no assistive device; intact sensation; and normal mood and affect. (R. at 996.)

On January 30, 2017, Cameron Ratcliff, PA, a physician assistant, completed a medical assessment, finding that Crewey could frequently lift and carry items weighing up to 10 pounds; occasionally lift and carry items weighing up to 50 pounds; rarely lift and carry items weighing up to 100 pounds; sit for one hour at a time and for a total of four hours in an eight-hour workday; stand for 20 minutes at a time and for a total of two hours in an eight-hour workday; and walk for 10 minutes at a time and for a total of one hour or less in an eight-hour workday. (R. at 1119-23.) For the rest of the day, according to Ratcliff, Crewey would need to lie down and rest with his legs elevated. (R. at 1120.) Ratcliff opined that Crewey needed a cane to ambulate; that he could ambulate only 20 feet without a cane; and could use his free hand to carry small objects. (R. at 1120.) He found that Crewy could frequently use his hands to reach, to handle, to finger, to feel and to push/pull; rarely use his feet to operate foot controls; rarely climb stairs, ramps, ladders and scaffolds, balance, stoop, kneel, crouch, and crawl; rarely be exposed to unprotected heights, moving mechanical parts, extreme temperatures and vibrations; and occasionally operate a motor vehicle and be exposed to humidity and wetness. (R. at 1120-22.) He acknowledged that Crewey could perform activities like shop with limitations, travel without a companion for assistance, use standard public transportation, prepare a simple meal and feed himself, care for his personal hygiene and sort, handle and use paper files. (R. at

1123.) Ratcliff estimated that Crewey would be absent from work six days per month. (R. at 1123.)

Ratcliff also completed a pain assessment, indicating that Crewey's pain was present to such an extent as to be distracting to adequate performance of daily activities and work; his physical activity, such as walking, standing and bending, increased his pain to the extent that medication and/or bed rest was necessary; and medication impacted his work ability to the extent that it would severely limit Crewey's effectiveness in the workplace due to distraction, inattention and drowsiness. (R. at 1124.)

On February 1, 2017, Dr. Pijanowski completed a medical assessment, indicating that Crewey could occasionally lift and carry items weighing up to 10 pounds; rarely lift and carry items weighing up to 50 pounds; and never lift and carry items weighing more than 50 pounds. (R. at 1110-14.) He opined that Crewey could sit a total of one hour in an eight-hour workday and could do so without interruption; he could stand a total of one hour in an eight-hour workday and could do so for 30 minutes without interruption; and walk a total of one hour in an eight-hour workday and could do so for 30 minutes without interruption. (R. at 1111.) Dr. Pijanowski found that for the remainder of the eight-hour day, Crewey could perform light duty work, and he could work only minimal hours. (R. at 1111.) He reported that Crewey could ambulate without the use of a cane up to 200 feet; his use of the cane was medically necessary; and he could use his free hand to carry small objects. (R. at 1111.) Dr. Pijanowski opined that Crewey could occasionally reach, handle and finger and rarely push and pull with his hands. (R. at 1111.) Dr. Pijanowski found that Crewey could occasionally work around moving mechanical parts, humidity and wetness, dust, odors, fumes and pulmonary

irritants, temperature extremes and loud noise; he could occasionally operate a motor vehicle; and never work around unprotected heights. (R. at 1112.) Dr. Pijanowski reported that Crewey could occasionally operate foot controls and occasionally climb ramps and stairs, but never perform other postural maneuvers. (R. at 1113.) Although Dr. Pijanowski opined that Crewey would be absent from work 10 days a month due to severe gout, he reported that Crewey's gout was under fair control. (R. at 1114.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2018). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2018).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2)(A) (West 2011 & 2018

Supp.); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Crewey argues that the ALJ erred by improperly weighing the medical evidence. (Plaintiff's Brief at 3-7.) In particular, Crewey argues that the ALJ erred by giving "significant weight" to the state agency physician's opinion and by giving "reduced weight" to his treating physicians. (Plaintiff's Brief at 3-7.) Crewey also argues that the ALJ erred by substituting his opinion for those of his treating physicians rather than to further develop the record. (Plaintiff's Brief at 3, 7.) Crewey further argues that the ALJ erred by finding that certain of his activities suggested work activity. (Plaintiff's Brief at 3, 8-9.)

Crewey argues that the ALJ erred by assigning "reduced weight" to the opinions of his treating providers, Ratcliff, Dr. Pijanowski, Dr. Wolfe and Dr. Gruhn, while giving "some weight" to the opinion of the initial state agency physician and "significant weight" to the opinion of the physician who considered the evidence on reconsideration. (Plaintiff's Brief at 3-6.) Based on my review of

the record, I find this argument unpersuasive. While the ALJ, in general, is required to give more weight to opinion evidence from examining versus nonexamining medical sources, the ALJ is not required to give controlling weight to the opinions of a consultative examiner. *See* 20 C.F.R. § 416.927(c) (2018). In fact, even an opinion from a treating physician will be accorded significantly less weight if it is "not supported by clinical evidence or if it is inconsistent with other substantial evidence…." *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996). Furthermore, the ALJ is entitled to rely on a nonexamining source's medical opinion where that opinion is supported by the record as a whole. *See Alla Z. v. Berryhill*, 2018 WL 4704060, at *11 (W.D. Va. Sept. 30, 2018); *see also* 20 C.F.R. § 404.1527(c)(3) (2018).

The ALJ stated that he was giving "reduced weight" to Dr. Wolfe's January 10, 2014, opinion that Crewey could not return to work and was expected to be disabled for at least 12 months. (R. at 29, 660.) On October 13, 2014, one year after Crewey's left knee replacement, Dr. Wolfe wrote in his treatment notes that Crewey was unable to return to work because of pain in his right knee. (R. at 670.) The ALJ noted that he was giving Dr. Wolfe's opinion "reduced weight" because it was inconsistent with his own examining findings of the right knee, which showed range of motion from five degrees to 100 degrees and no warmth, redness or pathologic laxity. (R. at 29, 670.) Dr. Wolfe noted that Crewey was doing well with his left knee. (R. at 671.) In addition, the ALJ noted that Dr. Wolfe's opinion was inconsistent with the objective findings of Crewey's rheumatologist, Dr. Lambert, and emergency room examinations. (R. at 29.) In November 2013, Dr. Lambert noted that Crewey had full range of motion in his ankles and no tenderness or swelling. (R. at 458.) Dr. Lambert noted that Crewey's gout could be controlled, and it would not affect his ability to return to work. (R. at 459.)

-22-

Emergency room records from November 2013 through January 2014 reveal tenderness in Crewey's left knee and left wrist, but an ultrasound and x-rays were normal. (R. at 700, 703, 713, 717, 743, 749.)

The ALJ gave Dr. Gruhn's opinion "reduced weight" because, at the time the opinion was offered, he had seen Crewey only once. (R. at 29.) Crewey reported at this visit that he was unable to take his gout medication consistently due to cost concerns, and, at the next visit, Crewey's gout had improved after a short period of medication compliance. (R. at 29, 650, 654.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986). Finally, the ALJ considered that Dr. Gruhn's physical examination findings undermined his extreme opinion, given that the only remarkable findings were swelling in Crewey's joints. (R. at 29, 650, 655.)

The ALJ stated that he was giving "reduced weight" to Ratcliff's opinions, noting that Crewey saw this provider only once. (R. at 29.)  The ALJ further noted that the record as a whole did not support the limitations assessed by Ratcliff, including her opinion that Crewey needed a cane to ambulate. (R. at 29.) The medical evidence shows that Crewey told his pain management providers that his pain was well-controlled; his pain medication improved his function significantly; he experienced no side effects from his pain medication; and he was satisfied with his pain control. (R. at 994, 999, 1004, 1008-09, 1014, 1016, 1018-20, 1026-28, 1030-32, 1033-37, 1042, 1048-49, 1052, 1060, 1065, 1069, 1073-74, 1081, 1085-86, 1088-90, 1093-94, 1097-98, 1101-02, 1105-06.) In September 2016, Crewey rated his then-current pain as a four on a 10-point scale, and he stated that he was very pleased with his improved sleep and activity level. (R. at 1014.) He estimated

that his pain medication improved his function by 80 percent. (R. at 1014.) *See Gross*, 785 F.2d at 1166. The ALJ noted that Ratcliff's estimates of Crewey's pain were inconsistent with Crewey's own statements and failed to consider his drug-seeking behavior. (R. at 29.)

The ALJ gave Dr. Pijanowski's opinion "reduced weight" because it was out of proportion with his own medical findings and Crewey's reports of good pain control. (R. at 29.) Dr. Pijanowski's opinion also was undermined by Crewey's medical history showing improvement after medication compliance. (R. at 650.)

The ALJ stated that he was giving "some weight" to the assessment of state agency physician Dr. Bacani-Longa, who opined that Crewey was capable of light work; however, the ALJ found that the evidence was more consistent with limiting Crewey to sedentary work based on his continued complaints of bilateral leg pain and gout flares. (R. at 28, 67-69.) The ALJ further stated that he was giving "significant weight" to the assessment of state agency physician Dr. Spetzler, who opined that Crewey was capable of sedentary work because he was limited to two hours of standing and/or walking. (R. at 28, 80-82.) The ALJ noted that Dr. Spetzler's opinion was consistent with the treatment notes contained in the record. *See Campbell v. Bowen*, 800 F.2d 1247, 1250 (4th Cir. 1986) (Fourth Circuit cases "clearly contemplate the possibility that [treating physician] opinions may be rejected in particular cases in deference to conflicting opinions of non-treating physicians").

The ALJ acknowledged that Crewey experienced functional limitations due to his left total knee replacement, gout flares and osteoarthritis, but the record revealed that Crewey's functional abilities improved on pain medication and when

on a consistent medical regime for his gout. (R. at 28.) The ALJ further noted that the record documented Crewey engaging in some physically demanding activities throughout the relevant time period, such as mowing the lawn, injuring himself on a tractor and hanging cabinets. (R. at 28, 44-45, 805, 928.) Based on this, I find that substantial evidence exists to support the ALJ's weighing of the evidence with regard to Crewey's residual functional capacity.

Crewey next argues that this case should be remanded because the ALJ should have ordered a consultative examination to assess his physical condition. (Plaintiff's Brief at 7.) The regulations instruct that an ALJ "may purchase a consultative examination to try to resolve an inconsistency in the evidence, or when the evidence as a whole is insufficient" for the ALJ to reach a decision. *See* 20 C.F.R. § 404.1519a (2018). Thus, whether to order a consultative examination is soundly within the discretion of the ALJ. Here, there was no insufficiency in the evidence such that the ALJ abused his discretion by not obtaining a consultative examination. With respect to Crewey's physical residual functional capacity, the record contained Crewey's treatment notes from numerous medical providers, the opinions of two state agency experts and forms completed by several medical providers.

Crewey also argues that the ALJ had no basis to suggest that his activities of daily living undermine his claim of disabling limitations, and he challenges the ALJ's reference to drug-seeking behavior. (Plaintiff's Brief at 8-9.) However, a careful review of the record documents both of these activities, and the ALJ was entirely within his discretion to consider such information in evaluating Crewey's subjective complaints. The regulations provide that daily activities are relevant and can be considered in evaluating a claimant's symptoms. *See* 20 C.F.R. §

404.1529(c)(3)(i) (2018). Thus, the ALJ was well within his discretion to consider the fact that Crewey injured himself twice during the relevant period while working with a tractor. (R. at 44-45.) On one occasion, Crewey was mowing his lawn when he lost his balance and fell off of his tractor. (R. at 44.) Only two months later, Crewey was again mowing his lawn, and he drove too far up to a tree and smashed his chest against a branch. (R. at 45.) Given that Crewey argues that he cannot even perform sedentary work, the fact that he was able to mow his lawn is relevant to his claim, and the ALJ properly considered it.

Crewey further argues that there is no evidence in the record to support the ALJ's suggestion that he was abusing drugs. In fact, the record is replete with references to Crewey's drug-seeking behavior. For instance, during a February 2014 doctor visit, the medical provider documented her discussion with Crewey regarding his request for narcotic medication. (R. at 592.) She noted that she offered Crewey Ultram, but he stated that it was "like taking water," and Crewey also refused Mobic. (R. at 592.) The provider explained that narcotics were not prescribed to new patients, and Crewey responded that he wanted to see a provider that would "guarantee" him "pain pills." (R. at 592.) Crewey refused a referral to pain management and told the provider that she needed to provide him with pain medication. (R. at 592.) Crewey stated that he had visited many doctors in the surrounding area attempting to find a practitioner that would treat his medical problems. (R. at 592.) In August 2014, Crewey was discharged from Dr. Raju's practice for violation of his pain medication contract. (R. at 583.) In June 2016, Crewey's drug test was positive for amphetamine and methamphetamine, which he attributed to Sudafed, but the thresholds were high enough to suggest amphetamine abuse. (R. at 1022.) In August 2016, Crewey's drug screen was positive for alcohol, and he admitted to having a beer occasionally. (R. at 1015.) In October

2016, Crewey was counseled on compliance with his controlled substance agreement due to noncompliant pill count, opioid overuse, noncompliant urinary drug screen and failure to secure his opioid medications. (R. at 1012.) Thus, I find this argument is without merit.

Based on the above, I find that substantial evidence exists in the record to support the ALJ's finding that Crewey had the residual functional capacity to perform a limited range of sedentary work.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the ALJ's weighing of the medical evidence;

2. Substantial evidence exists in the record to support the ALJ's finding with regard to Crewey's physical residual functional capacity; and

3. Substantial evidence exists in the record to support the Commissioner's finding that Crewey was not disabled under the Act and was not entitled to DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2018):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:    August 13, 2019.

s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE